## Tonkin *v.* Tonkin, Appellant.

Argued October 2, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Joseph J. Lee,* with him *Frank G. Smith, Robert V. Maine, Frank A. Whitsett* and *Smith, Maine, Whitsett & Lee,* for appellants.

*W. Albert Ramey,* for appellees.

OPINION BY ROSS, J., January 20, 1953:

In this equity proceeding, plaintiffs seek to have a deed naming Sarah G. Tonkin, one of the defendants, as sole grantee and conveying to her a certain tract of land in Clearfield County, declared void for alteration and fraud, and a decree directing defendants to execute a reconveyance allotting plaintiffs the one-half interest which they claim. The prayer also is for the appointment of a receiver, for an injunction against encumbrance or conveyance to third persons, for payment to plaintiffs of their share of the land already transferred, and for an accounting. The case was heard by the president judge of the Court of Common Pleas of Clearfield County, sitting as chancellor, who made a decree substantially in accord with the prayer of the bill, and after defendants' exceptions were dismissed, they took this appeal.

Defendants are husband and wife. Plaintiffs are the widow and son of defendant husband's brother,

V. Ord Tonkin.

The facts, for the most part, are undisputed. Vincent Tonkin, father of V. Ord Tonkin and defendant A. Worth Tonkin, died testate on November 22, 1908, seized of vast acreages of land and various parcels of real estate situated in Clearfield and Indiana counties. The tract of land in question, known as the Skunk Bottom tract, was made up of two separate but adjoining tracts with a total area of 632 acres. From this acreage four smaller pieces of surface and coal were sold in prior years, totalling about 175 acres, leaving approximately 457 acres in fee plus all minerals under the 632-acre tract, except the coal under the 175 acres. Testator named a third son, R. Dudley Tonkin, as one of three executors and he has for a period of years served as the sole surviving executor.

In January 1943 the heirs of Vincent Tonkin met for the purpose of dividing the undisposed portions of realty belonging to the estate. R. D. Tonkin, the executor, testified that the total valuation allotted to each heir was $3,700, and that the tract here in question was selected by A. Worth Tonkin and V. Ord Tonkin, along with other tracts individually, to be theirs, each to take a one-half interest. Their original plan was to have the land surveyed to determine the location of a dividing line but, because of the expense entailed, the plan to survey was dispensed with and the brothers decided in lieu thereof to take a joint deed. Worth directed the executor that his interest in the estate be charged $1,700 for this property and that the deed be made to his wife Sarah. Ord made similar direction as to charging $1,700 against his interest and that the deed be made to his son Robert, one of the plaintiffs. The executor then had a deed prepared, dated January 12, 1943, which he signed, in which V. Ord Tonkin and Sarah G. Tonkin were named

grantees of the Skunk Bottom tract. On February 24, 1943 he enclosed the deed with deeds intended for other heirs with a letter to his sister, Mrs. Vivian Longacre, requesting her to deliver the deeds to the various grantees. She testified that she did so.

A. Worth Tonkin testified that he participated in the family distribution of the residue of his father's real estate, that he elected to take half of Skunk Bottom, his brother Ord to take the other half, but that he "didn't understand it would be an undivided half interest" and objected to the deed on that ground. On December 22, 1944 V. Ord Tonkin died. Sometime subsequent to that time Worth brought the deed, which had been kept at his home, to Dudley, the executor, and, as the latter testified, he "said that Ord had died very heavy in debt, and by having this property in common, he was afraid that Ord's Estate would lose it for his son and widow and offered—made me the proposition if I would change the deed, Sarah would hold the interest in trust until we learned how Ord's financial matters were . . ." Dudley, acting upon the suggestion, took the deed to his attorneys, who rewrote the first page, eliminating Ord's name as grantee and ostensibly granting the entire interest to Sarah. The original deed was typewritten. Its altered first sheet, with a line drawn through Ord's name as grantee, and the attorney's notations on the margins, identified as such by his law partner, was offered in evidence. Delivery was made to Worth for Sarah. At the same time the executor handed Worth a preliminary draft of a trust agreement, which document, however, was never executed or consummated. The executor as grantor did not again sign the deed after its alteration.

Appellants construe plaintiffs' theory of the case as an attempt to enforce an implied trust as to realty, and argue that since the original deed was dated Jan-

uary 12, 1943 and the bill was not brought until October 30, 1950, the cause of action comes within the purview of, and is barred by, section 6 of the Act of 1856, P. L. 532, 12 PS sec. 83, which provides: "No right of entry shall accrue, or action be maintained for a specific performance of any contract for the sale of any real estate, or for damages for noncompliance with any such contract, or to enforce any equity of redemption, after re-entry made for any condition broken, or to enforce, any implied or resulting trust as to realty, but within five years after such contract was made or such equity or trust accrued . . . unless such contract . . . or trust, shall have been acknowledged by writing to subsist, by the party to be charged therewith, within the same period . . ." Assuming the existence of a trust, it accrued not in January 1943 when the joint deed was executed but in April 1945 when the altered deed was handed to the defendant Worth for delivery to his wife, accompanied by the draft of a trust agreement. Had the latter been executed, an express trust would have arisen to which the Act of 1856 would have no application. It is abundantly clear from the record that the executor's intention with regard to alteration was not to derogate from plaintiffs' interest in the land but, by the trust device, to preserve it for them, and so understood by appellants. Hence, by operation of law, Sarah in April 1945 became constructive trustee as to plaintiffs' one-half interest. The bill for cancellation and reconveyance was not brought until October 1950, and appellants' contention that it is barred by the statute of limitation in the Act would be sound except for the important proviso of the act "That *as to any one affected with a trust, by reason of his fraud, the said limitation shall begin to run only from the discovery thereof, or when, by reasonable diligence, the party defrauded might have discovered the same . . .*"

(Italics ours.) The executor testified that plaintiffs had no knowledge concerning the dispute over the title to the land "up until Sarah refused to sign or do anything", when ("the end of 1949 or the first of 1950") for the first time he disclosed the situation to them. Appellants introduced no contradictory evidence on this point, and nothing in the record points to knowledge on the part of plaintiffs, or that there was cause to invoke inquiry. The limitation period of the statute, therefore, under the proviso, began to run against them as of the date of disclosure, and since they instituted this proceeding within a few months thereafter, the bill was timely brought.

Nor do we find merit in appellants' contention that the proceeding is barred by laches. Laches is an equitable doctrine and its application is governed by equitable principles depending on the particular circumstances of each case. Counsel for appellants urges upon us that plaintiffs neglected their legal duty of inquiry as to assets of their decedent until after the lapse of an unreasonable time after his death. We do not think so. As indicated, plaintiffs had no knowledge of the agreement to take title to the tract in joint ownership. The estate of Vincent Tonkin had been in the process of administration since his death in 1908. It was a family affair and, as the learned court below observed, "Family affairs are commonly handled carelessly, because brothers and sisters have grown accustomed to trust one another." There is, however, a more compelling reason for rejecting the contention of laches in this case. The deed in its original form was not recorded, and it was not until August 29, 1946, or 16 months after its alteration, that the altered deed was entered of record. Appellants give no explanation for this delay, although the deed was in their possession at their residence during that entire period except for

a short time required for the alteration. To sustain this defense would do violence to the principle that a party cannot profit by his own wrong, and appellants will not now be heard to plead laches when, by their failure to give notice by recording, they detained plaintiffs in the protection of their interests. We do not think the delay was unreasonable in the circumstances and no prejudice to appellants is shown to have been occasioned by it. *Brehm v. Brehm,* 347 Pa. 271, 275, 32 A. 2d 216.

Appellants rely on the deed in its present form as speaking for itself, and invoke the parol evidence rule, firmly embedded in the law of this Commonwealth by the leading case of *Gianni v. Russell & Co.,* 281 Pa. 320, 126 A. 791. The fallacy of their proposition lies in a misconstruction of the purpose of the present bill. As noted by the court below, this is not a proceeding to vary the terms of a subsisting valid instrument by oral evidence, but to reestablish the terms of the original deed and to have the property rights which vested thereunder judicially declared. The argument overlooks completely the existence of a writing setting forth the agreement of the brothers, and assumes that the deed in its present form, as tampered with, is an integrated instrument, to alter the terms of which parol evidence is inadmissible.

Had there been no exhibit of a writing to indicate the agreement between Ord and Worth Tonkin, the rule would still not preclude admission of oral testimony in this case for two reasons: First, the rule presupposes an instrument regular on its face. The *type-written* deed in its present form is irregular on its face. On its first page it names Sarah Tonkin as "grantee" whereas its warranty clause (which formed part of the original draft) uses the word "grantees" twice. Second, the rule is inapplicable where, as here,

fraud is alleged. We quote from *Gianni v. Russell & Co.,* supra, 281 Pa. 320, 126 A. 791, relied upon by appellants, at page 325: "There are, of course, certain exceptions to the parol evidence rule. . . . Plaintiff expressly rejects any idea of *fraud, accident or mistake* and they *are the foundation upon which any basis for admitting parol evidence to set up an entirely separate agreement within the scope of a written contract must be built. The evidence must be such as would cause a chancellor to reform the instrument and that would be done only for these reasons* (Pioso v. Bitzer, 209 Pa. 503) and this holds true where this essentially equitable relief is being given, in our Pennsylvania fashion, through common law forms." (Italics supplied.)

In effect, appellants request us to hold that the title of a joint owner may be divested by the simple expedient of retyping a page of the deed, naming one of two joint grantees as sole grantee and omitting the name of the other, and that the defrauded grantee and those claiming through him are then without remedy because barred by the parol evidence rule. Thus reduced to its essence, its untenability is apparent. Cf. *Lutz v. Matthews,* 37 Pa. Superior Ct. 354.

Appellants argue further that no fraud was proven, relying on *Maguire v. Wheeler,* 300 Pa. 513, 519-520, 150 A. 882, that the most that is involved here is a promise by defendant Worth Tonkin, and that promises made at the time of executing a contract, though not subsequently complied with, do not constitute fraud. In the *Maguire* case, the Supreme Court stated at page 520: "Where the person making the promise . . . intended at the time not to perform it, thus fraudulently making use of the promise as a device to procure the contract or deed, equity will grant relief. . . ." Intent being subjective, it can be gleaned only from the outward manifestations of the actor. We cannot

say that when the promise was made by the defendant Worth to have his wife hold title in trust for plaintiffs he then intended to appropriate their joint half of the property to the use of Sarah, but it is clear that such intent had come into existence before the time of the hearing. In any event, the omission of the name of V. Ord Tonkin on the altered first sheet of the deed certainly constitutes such material alteration, to the prejudice of plaintiffs' rights, as to amount to forgery, the legal effect of which is to void the instrument (*Shay v. Merchants Banking Trust Co.*, 335 Pa. 101, 104, 6 A. 2d 536; *Flitcraft v. Commonwealth Title Insurance & Trust Co.*, 211 Pa. 114, 60 A. 557), and equity may decree the cancellation of a written instrument found to be a forgery. *Fleming's Estate*, 265 Pa. 399, 109 A. 265.

Both defendants denied participation in the alteration. Defendant Sarah was asked whether prior to January 1950 she had any knowledge of some claim of interest by persons other than herself in the Skunk Bottom tract. She evaded the question three times and finally, when pressed for an answer by the chancellor, replied, "They had had discussions." Dudley Tonkin, called in rebuttal, testified as to discussions between him and Worth "since April 1945" and stated that on some of these occasions his sister-in-law had been present in the room and must have heard the conversations. It is well settled that the credibility of witnesses is for the chancellor. This Court on appeal will not arbitrarily disregard the trier's right to pass on the credibility of witnesses and substitute its judgment for that of the fact-finder. *Reichert Estate*, 356 Pa. 269, 275, 51 A. 2d 615. We add parenthetically that from our independent examination of the testimony of the wife defendant we noted throughout an evasiveness and a reluctance to give responsive answers,

which, even though appearing in the cold record, left us with distinct impression of incredibility.

The chancellor considered the evidence sufficiently unequivocal to justify him in making findings of fact in accord with the prayer of the bill and to require him to reject contradictory evidence offered by defendants. Although the evidence justifying a chancellor to set aside an instrument on the ground of fraud must be clear, precise and indubitable, it is unnecessary that it be uncontradicted, but only that it carry to the mind the conviction of its truth. *Bieranowski v. Bieranowski,* 345 Pa. 447, 449, 29 A. 2d 11. As the evidence supports the findings and the decree, we accept them as we would accept the verdict of a jury. *Rayman v. Morris,* 361 Pa. 583, 65 A. 2d 397; *Christy v. Christy,* 353 Pa. 476, 46 A. 2d 169.

Decree affirmed at cost of the appellants.