## Penn-Allen Broadcasting Company *v.* Traylor, Appellant.

Argued June 3, 1957.

*Orrin E. Doyle,* with him *Claude T. Reno* and *Martin J. Coyne,* for appellant.

*Harry A. Dower,* with him *James D. Christie, Eugene K. Twining,* and *Perkin, Twining & Dower,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 28, 1957:

The plaintiff, Penn-Allen Broadcasting Company, brought an action in assumpsit in the Court of Common Pleas of Lehigh County against S. W. Traylor, Jr., to recover the sum of $47,547.50 due on a subscription agreement executed by him. Traylor denied liability, averring certain defenses which will hereinafter be discussed. The case came on for trial and the Court di-

rected a verdict for the plaintiff in the amount sued for, plus interest. Upon refusal of the Court below to enter judgment n.o.v., or order a new trial, the defendant appealed.

In order clearly to understand the questions raised on appeal it is necessary to quote verbatim the agreement which the defendant signed on October 17, 1952. It here follows:

SUBSCRIPTION
PENN-ALLEN BROADCASTING
COMPANY
Masonic Temple Building
Allentown, Pennsylvania

Gentlemen:

I hereby subscribe to 715 units of your capital stock, consisting of 1430 shares of Common and 3375 shares of Class A Common, from Offering Circular dated October 7, 1952, at the subscription price of ten dollars ($10.00) per share, and hand you herewith $2502.50 dollars ($2502.50), representing five percent (5%) payment on account of such subscription, the balance of the subscription to be payable on call of the Board of Directors after such time and provided that, the Company is granted a television Construction Permit by the Federal Communications Commission, and provided that not less than thirty (30) days' notice of such call shall be given. It is expressly and definitely understood that in the event a Construction Permit for a television station is not granted by the FCC to the Company, the remaining ninety-five percentum (95%) of the total subscription price for shares of Class A Common Stock and Common Stock, as set forth in the Offering Circular, is thereupon cancelled, and that this same ninety-five percentum (95%) of the subscription contract is null and void. The five percentum (5%) down payment mentioned above shall remain

with the Company and be evidenced by the issuance of shares of the Company in the ratio of two (2) shares of Common Stock and five (5) shares of Class A Common Stock, provided, however, that no fractional shares of the Common Stock shall be issued but any amount remaining after whole shares of Common Stock are computed in the 2:5 ratio shall be issued in whole and fractional Class A Common Shares.

My signature affixed below attests to my subscription of your stock as follows:

. . .

Down
Payment $ 2502.50        Balance $ 47,547.50
  179.25  Class A Common 3395.75 Class A Common
   71     Common         1359    Common
                    (Signed) S. W. Traylor, Jr.
                    Address Hotel Traylor
                            Allentown, Pa.
                    Dated this 17th day of Oct., 1952
Accepted this 18th day
   of Oct., 1952
Penn-Allen Broadcasting Company
By  Raymond J. Kohn
Title  (s)  President

The defendant paid the indicated sum of $2502.50, but on February 9, 1953, wrote the plaintiff company withdrawing his offer to purchase the remaining 95% of stock. It is his contention that the above quoted agreement was a divisible one—partly executed and partly executory. He maintains that the $2502.50 paid by him was not a down payment on the entire contract, the receipt of which constituted an acceptance of the whole contract by the plaintiff company, but an outright purchase of the 5% of stock. In this respect, he maintains, the contract was therefore executed. As to the remaining 95% of the stock he argues the con-

tract was executory, conditioned upon receipt by the plaintiff company of a television construction permit and, since he had withdrawn his offer before the plaintiff had accepted what the defendant regards as the executory part of the contract, he was thus relieved of all liability as to the 95% of stock.

A reading of the contract, however, refutes the defendant's interpretation. In the clearest of language the defendant subscribed to "715 units" of capital stock, "consisting of 1430 shares of Common and 3375 shares of Class A Common". Hence, his subscription was not for only 5%, i.e., 71 shares of Common and 179 shares of Class A Common, as he contends. The $2,502.50 paid by Traylor was a "down payment," specifically so designated, "on account of such subscription," the whole subscription being 715 units. On the side of the defendant it is conceded that there was an escape clause so far as purchase of 95% of the stock was concerned: if the plaintiff company failed to obtain a construction permit from the Federal Communications Commission, the provision regarding 95% of the stock was to be "null and void." However, this escape dissolved, when the plaintiff met the condition specified by obtaining the construction permit on July 15, 1953.

The defendant complains that the plaintiff company never formally acknowledged his acceptance of the contract, but he does not deny that the plaintiff deposited the defendant's check and that the cancelled check in due course came back to him for his records. The acceptance and the depositing of the defendant's check, representing down payment on the entire contract, bound the plaintiff irrevocably. Why should it not equally bind the defendant? Once two parties to an agreement meet on the pier of mutual consideration

and agree to sail together, neither can prevent the ship from lifting anchor and setting out on the sea of financial responsibility, one to the other.

The defendant maintains further that if the plaintiff company is entitled to recover at all, it may collect only the difference between the contract price and the market value of the stock as determined at the time the lawsuit was launched. But it is to be observed in this connection that, as pointed out in the Court below, the plaintiff corporation is authorized under the Business Corporation Law of 1933 (Act of May 5, 1933, P. L. 364, 15 P.S. 2852-201, et seq.), to recover the balance due, as specified in the subscription contract. Article VI, section 604, 15 P.S. 2852-604, of that Act provides: "Unless otherwise provided in the subscription agreement, subscriptions for shares, whether made before or after the organization of a corporation, shall be paid in full at such time, or in such installments and at such times, as shall be determined by the board of directors . . ."

By the use of the words "whether made before or after the organization of a corporation," it is clear the Legislature intended to wipe out all distinction between subscriptions for shares in corporations to be formed and those already organized—that is, both types of subscriptions are to be paid in full.*

Article VI, section 605 of the Act then provides for remedies where there has been a default in payment of the consideration for contracted shares: "When any shareholder fails to pay any call upon his shares properly made by the directors, at the time when such payment is due, the directors may proceed to collect

---

* This legislation effected a change in prior case law: *Bole v. Fulton*, 233 Pa. 609; *Bender, Trustee v. Wiggins et al., Executors*, 323 Pa. 182; *Schwartz v. Manufacturers' Casualty Ins. Co.*, 335 Pa. 130.

*the amount due in the same manner as any debt due the corporation,* or they *may* sell, at public sale, such part of the shares of the delinquent shareholder as will pay all or any part of the installments then due from him, with interest and all incidental expenses, and transfer the shares so sold to the purchaser, who shall be entitled to a certificate therefor. . ." Under this legislation the corporation involved acquires the right "to collect the amount due" in the same manner that it would collect any other debt due the corporation, and may consequently proceed in assumpsit as the plaintiff did here.

During the trial the defendant offered to show that the plaintiff could have sold his subscribed stock to Radio Station WWDC in Washington, D. C., which had already purchased the entire unsubscribed issue of the plaintiff's stock. The Court rejected the offer, and properly so. Under Section 605, hereinbefore quoted, the right given to the corporation to sell the stock upon default and to hold the subscriber for the deficit is an *option* enjoyed by the corporation; the subscriber may not compel the corporation to sell his stock to follow his desires.

Nor can the defendant avail himself, as he attempts to do, of the defense that the plaintiff did not tender the controverted stock to him. On February 9, 1953, he notified the plaintiff that he desired to withdraw his "offer." He ignored two communications sent him by the plaintiff company in each of which he was notified that "certificates . . . for the total number of shares covered by your subscription agreement will be forwarded promptly upon receipt of the balance shown above." After the defendant had erected a wall of such hostile non-cooperation, a tender of the stock by the plaintiff would have been a ceremony, gilt-edged but meaningless.

The defendant charges the plaintiff company with violation of The Pennsylvania Securities Act by improperly receiving exemption from registration as a dealer in securities (Act of 1939, P.L. 748, as amended). Even if we could collaterally inquire into the order of the Securities Commission granting the exemption, and it should be established the corporation was subject to penal provisions in the Act, this still would not nullify the defendant's obligations under his contract because the Securities Act does not provide for nullification under such circumstances.

The defendant alleges fraud on the part of the plaintiff corporation in obtaining the agreement: "when plaintiff's treasurer, Horace Gross, first approached defendant in July 1952 for the purpose of securing a financial statement and the letter of intent to subscribe dated July 10, 1952, Gross told defendant that the latter would not be bound to purchase any stock which he did not want and that plaintiff could and would sell to others all of the shares which defendant did not wish to buy." Even if this accusation developed into proved fact, it nevertheless could not wipe out the obligation voluntarily entered into by the defendant. As we said in *Berwick Hotel Co. v. Vaughn*, 300 Pa. 389, 393: "To authorize the rescission of a subscription to stock, as having been induced by misrepresentations, it must be alleged and proved that there was a false statement of facts made with fraudulent intent, which was relied on . . .; and, as a general rule, a statement to constitute a false and fraudulent representation must be a representation of fact, and not a mere expression of opinion, belief, or prediction: 2 Fletcher's Cyc. of Corporations, page 1359."

One contemplating a contract cannot rely on a mere promise made by the opposite party or one speaking in his behalf, unless the promise is included in the written agreement which merges the entire understanding of

the parties, unless, of course, it was excluded because of demonstrated fraud, fortuitous accident, or revealed mistake. None of these disabling situations is averred, much less proved.

As a second ground for its complaint of fraud, defendant claims that "plaintiff's officers were in a superior position so far as knowledge of technical matters involving plaintiff's position in the television field was concerned, that they were under a duty to disclose the full picture to defendant and that they failed so to do as a result of which the defendant was grossly misled."

It seems that originally the plaintiff company had intended to make application to the Federal Communications Commission for a Very High Frequency channel, but later changed this to applications for Ultra High Frequency channels. The defendant contends that since he was already a stockholder of the corporation he stood in a confidential relationship with the plaintiff company officials and that, therefore, he should have been informed of this change in plans. However, it is to be noted that whatever discussions occurred between the company officials and the defendant did not pertain to the stock already owned by the defendant but concerned his new subscription to stock, as to which no confidential relationship existed between defendant and the officers of the plaintiff company. If the defendant desired that his subscription contract was to be conditioned upon the company's making application for and securing a Very High Frequency channel, he should have had such provision included in the agreement. Since no such condition was incorporated into the agreement and since it is not alleged that such a condition was omitted because of fraud, accident, or mistake, it follows that the defendant is bound by the agreement as he executed it.

Judgment affirmed.