Berkowitz, Appellant, *v.* Mayflower Securities, Inc.

Argued November 14, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Donald M. Bowman,* with him *Gold, Bowman and Korman,* for appellant.

*Marvin Katz,* for appellee.

OPINION BY MR. JUSTICE EAGEN, March 25, 1974:

In this action in equity, the chancellor entered an adjudication and decree nisi in favor of the defendant. Plaintiff's exceptions were dismissed, and this appeal followed.

This is the factual background disclosed by the record.

The defendant, a stock brokerage firm in New York City, was the sole underwriter of an original issue of 3i Company—Information Interscience Incorporated [3i Company] common stock.[1] The plaintiff was recommended to the defendant by the president of 3i Company as a subscriber for 100 shares. On February 26, 1968, the defendant caused to be prepared a confirmation for the purchase of 100 shares of common stock of 3i Company in the plaintiff's name at the offering price of $5 per share. This confirmation was mailed to the plaintiff on the same date at his home address in Jenkintown, Pennsylvania, showing a trade date of

---

[1] 3i Company was originally incorporated in 1966 under a slightly different corporate name.

February 26, 1968, and a settlement date of March 4, 1968. On March 1st, the defendant had a certificate for 100 shares of the stock of 3i Company issued in the plaintiff's name. On March 7th, not having received payment for the stock, the defendant cancelled the plaintiff's order. On that date the stock was trading between $7.50 and $8 per share. Thereafter, the defendant endorsed the plaintiff's name on the back of the stock certificate issued in his name and guaranteed the signature was authentic. On March 27th, the defendant transferred the certificate to its nominee, Flow & Company, at no gain to itself. On October 10th, the plaintiff tendered payment for the stock to the defendant at its initial offering price and demanded delivery. The defendant rejected the tender. This action was then instituted to have the defendant declared a constructive trustee and directed to account to the plaintiff for the 100 shares of stock.[2]

At trial, the plaintiff testified he never received the confirmation notice mailed by the defendant on February 26, 1968, or any other communication indicating that the order for the purchase of the stock in his name had been fulfilled.[3] However, the chancellor

---

[2] The question of equity's jurisdiction has never been raised in these proceedings, and, generally, equity will not decree the specific performance of contracts for securities or stock, because of the existence of an adequate remedy at law. However, if a fiduciary relationship exists between the parties or where the contract to convey the securities or stock is clear, and the uncertain value of the securities or stock renders it difficult to do justice by an award of damages, specific performance will be decreed. See *Goodwin Gas Stove & Meter Company's Appeal*, 117 Pa. 514 (1888). We have previously declared that the relationship between a stock broker and its clients is one of a fiduciary duty and is in the nature of a trust. See *Butcher v. Newburger*, 318 Pa. 547, 179 A. 240 (1935).

[3] The plaintiff also stated that as result of failing to receive any notification from the defendant to the contrary, he assumed he had been "shut out", i.e., his subscription for the stock had been

found as a fact that written confirmation was mailed by the defendant to the plaintiff at his home address with the settlement date specifically stated to be March 4, 1968. This finding will not be disturbed on appeal, since there is adequate evidence in the record to sustain it. See *Van Products Company v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A. 2d 769 (1965). Furthermore, finding this confirmation was mailed creates a rebuttable presumption the confirmation was in fact received. *Paul v. Dwyer*, 410 Pa. 229, 188 A. 2d 753 (1963), and *Meierdierck v. Miller*, 394 Pa. 484, 147 A. 2d 406 (1959). Also, a denial of receipt is not sufficient, in itself, to rebut this presumption. See *Meierdierck v. Miller*, supra.

Plaintiff contends the defendant failed to exercise a reasonable effort to protect his interests and thus violated its fiduciary duty. He argues that, at the very least, he was entitled to some communication notifying him of the pending cancellation of his order for the stock. This position is appealing, but is not supported by the law.

A subscription for shares of stock in an existing corporation is simply a contract of purchase and sale. *Bole v. Fulton*, 233 Pa. 609, 82 A. 947 (1912). Accord, *Schwartz v. Manufacturer's Casualty Insurance Company*, 335 Pa. 130, 6 A. 2d 299 (1939), and *Bender v. Wiggins*, 323 Pa. 182, 185 A. 730 (1936).[4] Thus, we look at the present problem in simple contract terms, and, so viewed, it is apparent the plaintiff's failure to pay for the stock constituted a material breach of the

refused, and that he did not learn of the purchase of the stock in his name until on or about October 8, 1968.

[4] Although *Penn-Allen Broadcasting Co. v. Traylor*, 389 Pa. 490, 133 A. 2d 528 (1957), modifies the cited authorities, it does so in areas different from those here concerned. See Sell, Corporations, 20 U. Pitt. L. Rev. 327 (1958).

contract which relieved the defendant from any duty thereunder. See 6 Williston on Contracts §846 (3d Ed. 1962), and Restatement of Contracts, §275 (1933). Moreover, if we view the situation as constituting a completed contract, that is as an offer by the plaintiff, which was accepted by the defendant, the contract became void as to the plaintiff by operation of law under Federal Reserve Regulations[5] by reason of plaintiff's failure to pay for the stock on or before the settlement date. See *Pearlstein v. Scudder & German,* 429 F. 2d 1136 (2d Cir. 1970); *Greater Iowa Corporation v. McLendon,* 378 F. 2d 783 (8th Cir. 1967); and, *Royal Air Properties, Inc. v. Smith,* 312 F. 2d 210 (9th Cir. 1962).

Decree affirmed. Each party to pay own costs.

Mr. Justice POMEROY dissents.

---

[5] Section 7(c) of the Securities Exchange Act of 1934, 15 U.S.C. §78g(c) states:

"78g Margin requirements

. . . .

"(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

. . . .

"(1) On any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section;" Regulation T of the Federal Reserve System, 12 C.F.R. §220.4(c)(2) promulgated pursuant to 15 U.S.C. §78g(a), reads in part: "in case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days after the date on which the security is so purchased, the creditor shall, except as provided in sub-paragraphs (3)-(7) of this paragraph, promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof."

The seven days discussed in this regulation refers to seven full business days.

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

At a moment in our jurisprudence when society expects the highest degree of integrity of those holding positions of public trust and confidence,[1] it is shocking indeed to witness a licensed securities dealer abuse its position of trust. In my view, this Court unwisely chooses to approve the lawless conduct of Mayflower Securities. I dissent from the majority's failure to condemn Mayflower's resort to self-help.

The pertinent facts are undisputed. Mayflower, the sole underwriter of a new issue of 3i Company, received from appellant an indication of interest to purchase 100 shares. Shortly after February 26, 1968, the effective date of the distribution, a confirmation for the purchase of 100 shares and a prospectus was sent by ordinary mail to appellant. On March 1, 1968, Mayflower opened an account in appellant's name and issued a stock certificate for 100 shares, registered in his name. Not hearing from appellant by March 7, and relying on the proscription of regulation T,[2] appellee

---

[1] The words of Chief Justice CARDOZO in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1929), never tire of repetition. "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." See also *Seaboard Indus., Inc. v. Monaco*, 442 Pa. 256, 276 A.2d 305 (1971).

[2] 12 C.F.R. § 220.4(c) (1973). Regulation T is one of the margin requirements issued by the Board of Governors of the Federal Reserve System under the authority of § 7 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78g (1971).

transferred the 100 shares to its nominee, Flow & Company. To do so appellee forged appellant's name.

Having opened an account in appellant's name and having registered securities in his name, appellee in order to transfer those securities could not resort to self-help, as it did. That appellant failed, according to appellee, to respond to a letter sent by ordinary mail did not justify appellee's forgery of his name. No federal regulation, regardless of its significance, permits a licensed securities dealer in order to avoid the regulation's impact to forge a customer's endorsement on a stock certificate. Mayflower had before it other options, legal options, which it could have used to protect its rights. It chose not to act within the legal process, but to resort to self-help.

The forging of a customer's endorsement, especially by a fiduciary, is to be condemned. Recent developments in the regulation of securities dealers and other market participants "all point to the conclusion that the broker-dealer community will be forced to live up to the professional image which it has tried to create." Mundheim, Professional Responsibilities of Broker-Dealers: The Suitability Doctrine, 1965 Duke L.J. 445, 479. Appellee's forgery not only contravened the professional image of a licensed securities dealer, but was a clear violation of its fiduciary duty and its responsibility to engage in fair and equitable trading practices.[3]

The majority concedes that between Mayflower and appellant there existed a fiduciary relationship. See *Butcher v. Newburger*, 318 Pa. 547, 179 A. 240 (1935). The fact of forgery is also plain. Yet the majority, although sitting in review of a court of equity, chooses

---

[3] Section 1 of Article III of the Rules of Fair Practice of the National Association of Securities Dealers provides: "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." CCH NASD Manual ¶ 2151.

to deny appellant relief and to vindicate the fiduciary's conduct. In the past this Court has never been reluctant to grant relief to a party harmed by a forgery. E.g., *Austen v. Marzolf*, 294 Pa. 226, 143 A. 908 (1928);[4] *Walker v. Pennsylvania Co. for Insurances on Lives & Granting Annuities*, 263 Pa. 480, 106 A. 795 (1919);[5] *Cornwell v. J. W. Sparks & Co.*, 248 Pa. 109, 93 A. 868 (1915).[6]

---

[4] "Forgery is a heinous crime, which cannot be ratified." 294 Pa. at 229, 143 A. at 909.

[5] In *Walker v. Pennsylvania Co. for Ins. on Lives & Granting Annuities*, 263 Pa. 480, 106 A. 795 (1919), the plaintiff was able to recover from the trustee who transferred her securities and from bona fide purchasers for value, who all relied on a signature, ostensibly plaintiff's, but in fact forged by her attorney. Since the present case involves no third parties, and is a dispute between a party injured and the forger, there is stronger justification for decreeing specific performance in favor of appellant.

Moreover, in *Walker*, this Court considered the equitable position of the trustee who transferred plaintiff's securities. However, this Court refused to deny plaintiff relief and to decide "in favor of a trustee who has negligently acted to her injury, when it had the power, and there was cast upon it the duty, to protect both itself and her. When the forged power of attorney was presented to the trustee, it could have insisted that plaintiff be brought before it to acknowledge her signature, but it chose to rely upon Wagner's standing as an attorney, or upon the guarantee of plaintiff's signature by members of the stock exchange; and has only itself to blame for the situation in which it finds itself. It is not in position, being itself a wrongdoer, to invoke the doctrine of equitable estoppel as against plaintiff who has done no wrong, but simply trusted to her attorney not to wrong her, and to it, as her trustee, not to negligently deprive her of her property." Id. at 484, 106 A. at 796.

If, as in *Walker*, a trustee, acting in good faith but negligently, could not prevail over a person whose name had been forged by another because the trustee had a duty to verify the signature on the securities, how then can a court condone the very act of forgery by a fiduciary?

[6] "Upon the merits [the finding of a forgery] should be and is controlling in determining the legal rights of the parties." 248 Pa. at 114, 93 A. at 870.

There can be little doubt that equity may decree the cancellation of a forged written instrument. *Setlock v. Sutila*, 444 Pa. 552, 554, 282 A.2d 380, 381 (1971); *Fleming's Estate*, 265 Pa. 399, 109 A. 265 (1919);[7] *Flitcraft v. Commonwealth Title Insurance & Trust Co.*, 211 Pa. 114, 60 A. 577 (1905) (per curiam); *Shisler v. Vandike*, 92 Pa. 447 (1880); *Tonkin v. Tonkin*, 172 Pa. Superior Ct. 552, 561, 94 A.2d 192, 196 (1953); *Heinrich Chemical Co. v. Ingram*, 104 Pa. Superior Ct. 257, 260, 159 A. 77, 78 (1932) ("a forged contract amounts to nothing"). See generally D. Dobbs, Handbook on the Law of Remedies § 9.6, at 645 (1973). This being so, equity certainly has the power to undo the effect of a transfer of securities brought about by forgery.

Relying on the inherent power of an equity court to redress a wrong and not allow a party to profit by his own wrongdoing, I would reverse the decree of the Court of Common Pleas of Philadelphia.

---

[7] "Fraud, of which forgery is a glaring example, is one of the principal grounds of equity jurisdiction, and, as a general rule, equity may decree the cancellation of a written instrument found to be a forgery." 265 Pa. at 407, 109 A. at 267-68.