Yohey *v.* Burton et al., Appellants.

Argued October 13, 1939.

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES,
JJ.

*Joseph Neff Ewing,* of *Saul, Ewing, Remick & Saul,* with him *Thomas P. Mikell,* for appellants.

*Ralph N. Kellam,* with him *W. Glenn George* and *Herbert G. Marvin,* for appellee.

OPINION BY CUNNINGHAM, J., March 18, 1940:

Defendants, partners in a stock brokerage business, have appealed ,from the action of the trial court in directing a verdict for plaintiff, a customer, in the amount of $1,894.72, at the conclusion of her action to recover damages for the alleged unlawful conversion of certain stocks held by defendants as collateral security in plaintiff's margin account.

If plaintiff is entitled to recover, the amount of the judgment entered on the verdict is not in controversy. Concededly, the trial judge properly ruled, as a matter of law, that the measure of damages is the difference between the amount for which the stocks were sold and their highest price within a reasonable time after their sale, fixing three days as that reasonable time. See Act of April 10, 1929, P. L. 476, Section 1, 68 PS §481.

The essential facts, with minor exceptions, are not in dispute. On March 24, 1937, plaintiff opened a trading account jointly in the name of herself and a sister, Violet Yohey. Subsequently she opened two additional accounts, one in her own name on May 19, 1937, and the other in the name of another sister, Florence Van Horn, on September 14, 1937. Plaintiff had general powers of attorney conferring upon her full authority to deal with the joint account and the Van Horn account as if they were in her own name.

The status of these three accounts on October 18, 1937, was as follows: In the joint account there were securities valued at $5,800, with a debit balance of $4,474.47, leaving an equity in favor of plaintiff of $1,325.53; in the Blanche Yohey account there were securities worth $4,200, with a debit balance of $4,037, leaving an equity in favor of plaintiff of $163; and in the Van Horn account plaintiff was short 100 shares of United States Steel Common, but had a cash credit balance of $4,090.87. Concededly, if the Van Horn account had been closed out on that date, there would have been a credit balance in the neighborhood of $4,575, which plaintiff had the right to use under the powers of attorney held by her to bolster the margin in either of the other accounts, if she so desired.

The worst break in the history of the market occurred in the month of October, 1937. During the week preceding October 18, 1937, defendants sent plaintiff a series of telegrams demanding additional collateral. Such a telegram had been dispatched to her on October 17, 1937. As plaintiff testified, on October 18, 1937, at about 2:45 P. M., she talked with defendants' manager, William F. Henshaw, Jr., with respect to putting up additional margin. She said that she discussed with him the advisability of covering her short position in steel. She further stated: "I went to Mr. Henshaw. I asked what I should do about it. He said, 'Oh, go home; sleep it over and cover it in the morning,' because I might get a better price for it." That is, cover at a lower price.

Her testimony in this respect was corroborated by the manager, who was no longer in the employ of defendants at the time of the trial and was called on behalf of plaintiff. His version was as follows: "Miss Yohey came to me near the close of that day, and more or less asked counsel. I said my advice was to wait until the following day. I advised it ought to be held over until the following day."

The evening of October 18, 1937, plaintiff was again notified by telegram to produce $1,100 by 10 A. M. the next morning or else the stocks protecting the joint account would be sold. The telegram read: "Your account needs $1100. Unless this amount is received before market opening Tuesday October Nineteenth we will be forced to liquidate sufficient collateral to protect your account."

Plaintiff testified that on the morning of October 19, 1937, she arrived at defendants' office at 9:45 A. M., and from the corridor saw that Henshaw, with whom she had transacted her business exclusively for a month prior to that date, was busy talking on the telephone. She waited for him to finish talking, and when he finally emerged and spoke to her, it was a few minutes after the market had opened, the opening having taken place at 10 A. M. She related in substance that she had come there to cover her short position in steel as a method of supplying the additional collateral demanded by the telegram of the previous evening. She testified: "Q. Tell us what happened on the morning of the 19th. A. I went to the door to see Mr. Henshaw, to tell him I was covering the steel this morning. He was busy on the phone. I stood there and waited for him. He motioned to me he would be with me in a few minutes. Well, it is like a little hall. You can see the board room, translux and the board. I was watching the market as it opened. I kept motioning to him to come on out. When Mr. Henshaw finally was through, he opened the door and came out. Q. What time was that? A. Ten or fifteen minutes after the market had opened. I said, 'Mr. Henshaw, I will take care of the steel; I will cover it—cover the steel, please'—By the Court: Q. Finally he came out and told you what? A. I was ready to cover the steel. When the market opened and steel was lower, I would buy it and take care of my margin call. Mr. Henshaw said to me 'Mr. Burton (one of the defendants) took that account out of my hands

this morning, and I have nothing more to do with it. He put your stocks up, sold them this morning—put them up for sale this morning.' By Mr. Kellam (counsel for plaintiff): Q. What did you say to that? A. I said, 'He can't do that; I am here to take care of my margin call.' " This testimony also was substantially corroborated by the manager.

Burton admitted he gave the order to sell the collateral at 9:58 A. M. or two minutes before the opening of the market. These orders were executed sometime during the morning, and the total receipts from the stocks sold were $2,624.23. At about 10:30 A. M. the same morning, plaintiff covered the steel, which gave her a cash credit balance of approximately $4,500 in the Van Horn account, an amount sufficient to supply the additional margin demanded by defendants. When plaintiff learned of the sale of the collateral in the joint account, she inquired as to which stocks had been sold, but the manager was unable to furnish this information at once.

Plaintiff made no demand upon defendants to repurchase the stocks which were sold, but according to her own testimony, said to the manager: "Find out what he sold, and we will buy those securities back. I didn't want to part with those securities."

Plaintiff continued to trade at the defendants' brokerage office daily for almost six months thereafter, taking away her accounts in March, 1938. She was not in any sense a novice at playing the market, and the record reveals that she understood marginal dealings fully. She had been buying and selling stocks for a period of ten years before the transaction here involved, and her practice was to be in defendants' office daily from the opening of the market to its close.

When the joint account was opened, plaintiff and her sister signed a "Customer's Agreement" addressed to defendants, which provided, inter alia: "Gentlemen: In consideration of your accepting one or more accounts of

the undersigned (whether designated by name, number or otherwise) and your agreeing to act as brokers for the undersigned in the purchase or sale of securities or commodities, the undersigned agrees as follows:

\* \* \* \* \*

"3. The undersigned will at all times maintain margins for said accounts, as required by you from time to time.

\* \* \* \* \*

"6. In the event of the death of the undersigned or whenever you shall deem it necessary for your protection, you are hereby authorized to sell any or all of the securities and commodities or other property which may be in your possession, or which you may be carrying for the undersigned (either individually or jointly with others), or to buy in any securities, commodities or other property of which the account or accounts of the undersigned may be short, in order to close out the account or accounts of the undersigned in whole or in part or in order to close out any commitment made in behalf of the undersigned. Such sale or purchase *may be made according to your judgment* and may be made, at your discretion, on the exchange or other market where such business is then usually transacted, or at public auction or at private sale, without advertising the same and *without notice to the undersigned* or to the personal representatives of the undersigned, and *without* prior tender, *demand* or *call* of any kind upon the undersigned or upon the personal representatives of the undersigned, and you may purchase the whole or any part thereof free from any right of redemption, and the undersigned shall remain liable for any deficiency;— it being understood that a prior tender, demand or call of any kind, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy any securities and/or commodities and/or other property held by you, or owed

you by the undersigned, at any time as hereinbefore provided.    (Italics supplied.)

\* \* \* \* \*

"10.   Reports of the execution of orders and statements of the accounts of the undersigned shall be conclusive if not objected to in writing, the former within two days, and the latter within ten days, after transmittal to the undersigned by mail or otherwise ......"

The first question involved upon this appeal is whether, under all the evidence, the learned trial judge was justified in holding, as he did and upon the grounds hereinafter considered, that the sale was so clearly unlawful that it became his duty to so declare as a matter of law.

Preliminarily, and in order to reach what we think is the heart of the case, attention may be given at this point to two of the three contentions advanced in behalf of defendants: First, that in selling the stocks they acted within the rights conferred upon them by the customer's agreement; and secondly, that under that agreement all reports of the execution of orders and all statements of account not objected to in writing within the prescribed limitations became conclusive, and since plaintiff had made no such objections she had no standing to maintain the present suit.

The trial judge held that although defendants had a right, under the terms of the customer's agreement, to sell the collateral without notice, the sending of the above quoted telegram amounted, under all the circumstances, to a waiver of such right and they were bound to give her an opportunity to comply with the terms specified in the margin call.

That there may be such a waiver, and that it need not be founded upon consideration, is well settled under the law of this state and other jurisdictions: *Emmons v. McCreery et al.*, 307 Pa. 62, 160 A. 722; *Rosenthal v. Brown et al.*, 247 N. Y. 479. As we view this case it is

not necessary to pass definitely upon this issue and for present purposes we assume there was a waiver.

Nor do we deem it necessary to dispose of defendants' contention that plaintiff is precluded from attacking sales to which she failed to object in writing in accordance with the provision contained in the customer's agreement. It may be that under the ruling of our Supreme Court in *Sisney v. Diffenderffer et al.*, 323 Pa. 337, 185 A. 830, such a provision is not binding on the customer where the broker has previously committed a material breach of his agreement with the customer. We shall consider that decision as applicable.

At the close of the testimony the trial judge said to the jury, "After considering the evidence in this case the court comes to the conclusion that it is bound to give you binding instructions to find in favor of the plaintiff ......" The primary question is whether he was justified in holding that plaintiff, under all the evidence, was entitled, as a matter of law, to this instruction.

The trial judge then proceeded to state his reasons for so holding. After reviewing the evidence in a general way he announced his fundamental legal proposition in this language: "If they sold [plaintiff] out before she had a fair chance to bring in the money after they fixed the dead-line, so to speak, when they would take it, they were bound to be there ready to receive it—to give her a chance to put up the $1100; and if they sold her out in the face of such a notice, it was an unlawful sale, and they would be liable for any damages resulting therefrom."

The contention advanced in behalf of defendants was that the evidence disclosed plaintiff failed to comply with their demand by supplying the required collateral, although she had ample opportunity to do so, and her non-compliance justified them in selling out the securities in the joint account.

The trial judge's conclusion was that defendants sold

the collateral before the time limit fixed in their notice —an act which, in and of itself, made the sale unlawful. An additional ground upon which the verdict was directed was that plaintiff had been ready and willing to comply with the margin call, but had been prevented by defendants from doing so.

These inferences and their legal effect were thus stated in the charge: "Mr. Burton, one of the defendants, who had charge of the accounts in New York, did not wait until ten o'clock Tuesday morning for her to bring in the money, although they gave her until that time. Before ten o'clock he gave the order to sell. That he had no right to do under the contract with the plaintiff. On that point alone, I think there is enough to constitute an unlawful sale ...... She went to the person with whom she had been dealing. The failure of the defendants to take care of her did not justify them, in the judgment of the court, in selling her out. If somebody connected with the concern had asked her: 'Are you here on a margin call,' she would have put up $1100, and she would not have been sold out. The time at which she came in is important. The court rules, from the undisputed evidence, that that sale was made before she had an opportunity ,to respond to the call they sent her."

We are not in accord with the court below in holding, as a matter of law, that the sale of the collateral was unlawful because the order to sell it was given at 9:58 A. M. The telegram advised that unless $1,100 was "received before market opening Tuesday October Nineteenth we will be forced to liquidate sufficient collateral to protect your account." In point of fact, the placing of the orders prior to 10 A. M. was not in itself a liquidation of the collateral. It is well known that such orders cannot be executed before the market opens at 10 A. M., and the evidence shows the securities were not sold before that time. True, the notice gave plaintiff until 10 A. M. to produce the additional margin,

**402**

and until 10 A. M. defendants could not lawfully sell
the collateral. It seems to us they fully met this obligation. Certainly they had the right to enter the orders
before the opening as long as they could not be executed
prior to the dead line set for the production of the additional margin. The orders were not executed in advance
of that time limit, and we think the court below erred
in holding that the mere entry of the orders prior
to 10 A. M. was a breach of the waiver agreement constituting a conversion of the securities in the joint account.

In considering the further holding of the trial judge
—that plaintiff had been "ready and able" to meet the
call but had been prevented by defendants from so doing, as the manager with whom she generally dealt was
too busy to take care of her and no other employee volunteered his services—some attention must be given to
the burden of proof resting upon her.

It must be borne in mind that if the defendants had
not, by their telegram, waived their right to sell the
collateral without notice to plaintiff, they could have
sold it at any time. This waiver was without consideration and amounted to an act of indulgence on the part
of the defendants. Under such circumstances, we think
plaintiff had the burden of proving compliance by her
with the terms of the waiver. That its terms were not
actually complied with is beyond dispute, and we are
unable to agree with the court below that under all the
evidence plaintiff was prevented by the defendants from
complying with their notice to her.

Plaintiff did not arrive at the office on the morning
of the 19th prepared and willing to deposit additional
stocks or securities of any kind to the value of $1100.
All she planned or was willing to do was to cover on
the steel in her sister's account in the event that steel
was lower. Her own testimony was: "I was ready to
cover the steel. When the market opened and steel was

lower, I would buy it and take care of my margin call." She also said, "I was watching the market as it opened."

Although a Mr. Means, through whom plaintiff had opened her account, and other employees of defendants were present ready to execute any orders she might give, plaintiff took no steps toward covering her steel until Henshaw was able to leave the telephone booth fifteen minutes after the market had opened. Her order to cover was not actually given until about 10:30 o'clock.

Granting, however, that she came to the office that morning with the intention of covering her short position in steel in order to bolster the collateral security in the joint account, the fact is that she lingered in the corridor waiting for the manager to finish his telephone conversation, although it is clear from her own testimony that she fully realized the fifteen minute period remaining to put her accounts on a satisfactory basis was rapidly expiring. She made no announcement of her plan to meet the call for additional margin until "ten or fifteen minutes after the market had opened." It seems to us that such conduct did not so clearly measure up, as a matter of law, to the performance of the duty resting upon the plaintiff, (particularly in view of the fact that Means, whose customer she had been for a considerable period of time, together with other employees, was present during the half hour which elapsed between her arrival at the office and Henshaw's release from the telephone) as to justify the direction of a verdict in her favor.

We feel the trial judge placed undue emphasis upon the fact that plaintiff had been conducting her recent market operations through Henshaw and for this reason was entitled to wait for him rather than to comply promptly with her obligation by placing her order to buy steel with one of the other numerous employees authorized to transact such business.

Plaintiff was not a tyro unacquainted with the busi-

ness methods prevailing in defendants' office. She had been trading in the market for some ten years and for weeks had been a daily frequenter of defendants' office during market hours. She had received demands for additional margin in the past and must have been thoroughly familiar with the necessity for quick action by brokers as a precaution against excessive losses in a fluctuating market.

Stockbrokers carrying marginal accounts do not receive remuneration commensurate with the risk of such loss, and hence must act swiftly in such cases. As stated by Meyer in his treatise entitled, "The Law of Stock Brokers and Stock Exchanges," at page 363: "When a customer buys or sells on margin the greater portion of the funds required for that purpose are usually furnished by the broker. The purchase or sale, however, is solely for the account of the customer, who is entitled to the emoluments and to the profits, if there are any, and who must bear the loss if a loss is sustained. The broker receives nothing except commissions for his services and interest for the use of his money. His remuneration does not include anything, either actual or potential, for assuming the risk of loss, and he therefore has a right to adequate protection against such risk."

The conclusion of a majority of the members of this court is that plaintiff failed to submit evidence from which a jury could reasonably be permitted to find she had performed, or in good faith tendered performance of, the legal duty imposed upon her by defendants' demand for additional margin. Defendants' point for binding instructions should have been affirmed or their subsequent motion for judgment in their favor, n. o. v., granted. The first, second, fourth and fifth assignments are sustained.

Judgment reversed and here entered in favor of appellants.