514 A.2d 552

**MERRILL LYNCH, PIERCE, FENNER & SMITH, Appellee,**

v.

**Ira B. PERELLE, Appellant.**

**MERRILL LYNCH, PIERCE, FENNER & SMITH, Appellant,**

v.

**Ira B. PERELLE, Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 11, 1984.

Filed Aug. 13, 1986.

David E. Sandel Jr., Philadelphia, for appellant (at 706) and for appellee (at 759).

C. Clark Hodgson, Jr., and Stephen C. Baker, Philadelphia, for appellant (at 759) and for appellee (at 706).

Before ROWLEY, McEWEN and HOFFMAN, JJ.

McEWEN, Judge:

Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter Merrill Lynch, appellant), a brokerage firm with offices in Philadelphia, instituted suit against appellee, Dr. Ira Perelle (hereinafter appellee), seeking sums allegedly due and owing to Merrill Lynch following liquidation of a margin account[1] maintained by appellee. Appellee counterclaimed for damages resulting from, *inter alia*, an alleged breach of the fiduciary duty owed by Merrill Lynch to appellee. Trial was held before the distinguished Judge Lois Forer sitting without a jury. The court awarded Merrill Lynch the sum of $20,191.77, representing the deficit which resulted when appellee's margin account was liquidated, plus interest, and awarded the sum of $13,715.50 to appellee on his counterclaim for breach of fiduciary duty. These awards resulted in the entry of a final judgment in the amount of $6,479.27 in favor of Merrill Lynch from which both parties have appealed.

Merrill Lynch argues that the trial court erred: (1) in finding that Merrill Lynch owed a fiduciary duty to appellee; (2) in finding the "shingle theory" of broker liability applicable; and (3) in finding that five days was a "reason-

---

1. "Briefly, a margin account is a loan: when one buys stock on margin, one pays only a portion of the total cost of the securities. The broker puts up the remainder of the money, charging the customer a monthly fee on the amount borrowed.

To purchase stock on margin, the NYSE requires that the customer (1) put up at least 50% of the cost of the stock, and (2) establish an equity equal to at least $2,000. Once the customer has bought stock on margin, the NYSE requires that the customer's equity in the account always represent at least 25% of the current market value of the stock. Most brokers require a 30% equity.

If a customer's equity falls below the 30% minimum (because the stock has gone down in value), the customer's account becomes subject to a 'maintenance margin call'. When such a call is made, the customer must deposit cash or collateral to maintain the account. If the customer is unable to meet a margin call, the broker will sell enough stock in the customer's margin account to meet the 30% maintenance requirements."
*Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 n. 10 (9th Cir.1980).

able time" for purposes of calculating damages on appellee's counterclaim for breach of fiduciary duty.

The trial court made the following findings of fact[2]:

1. Plaintiff, Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter "Merrill Lynch") is a registered broker-dealer engaged in the business of purchase and sale of securities on behalf of its customers.

2. Merrill Lynch is a New York corporation with offices in Philadelphia.

3. Defendant, Ira B. Perelle, (hereinafter "Perelle") is a resident of Bronxville, New York. (Testimony of Perelle).

4. On or about April 17, 1977, Perelle opened an account with Merrill Lynch in Philadelphia by telephone for the purpose of buying and selling securities. (Exhibit P-1; Testimony of Kirkpatrick and Perelle).

5. Perelle was referred to Merrill Lynch by a friend, Dr. Stanford Bazilian who was a customer of Merrill Lynch. Both Perelle and Bazilian were interested in trading in high risk investments. (Exhibit P-1, Testimony of Kirkpatrick and Perelle).

6. In May, 1977, Perelle and Merrill Lynch entered into a margin agreement. (Plaintiff's Request for Admissions No. 1 Defendant's Answer; Testimony of Kirkpatrick; Exhibit P-2).

7. The written margin agreement, a form supplied by Merrill Lynch, provided that in consideration for Merrill Lynch's agreeing to lend Perelle money, partially secured by securities which he purchased, such "securities ... now or hereafter carried by you [Merrill Lynch] in any of my accounts ... are to be held by you as security for the

---

2. There was considerable disagreement between the parties as to the events preceding the liquidation of appellee's margin account. However, the findings of fact of the trial court are supported by the evidence and are, therefore, binding upon this Court. *Princess Hotels International v. Hamilton,* 326 Pa.Super. 226, 231, 473 A.2d 1064, 1067 (1984); *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 113, 464 A.2d 1243, 1255 (1983).

payment of any liability to you in any of said accounts...."
(Exhibit P–2).

8.  The margin agreement further provided that Merrill Lynch

> "shall have the right, *whenever in your discretion* you consider it necessary for your protection ... to sell any or all outstanding contracts, *all without demand for margin or additional margin,* notice of sale or purchase or other notice or advertisement, and such sales or purchases may be made at your discretion on any exchange or other market where such business is then usually transacted ... *it being further understood that I shall at all times be liable for the payment of any debit balance owing in any of my accounts with you upon demand, and that I shall be liable for any deficiency remaining in such accounts in the event of the liquidation thereof in whole or in part by you or by me.*"

(Emphasis added).

9.  The margin account further provided that the "monthly debit balance in my [i.e., Perelle's] account(s) shall be charged, in accordance with your [i.e. Merrill Lynch's] usual custom with interest at a rate which shall include the average rate paid by you on general loans during the period covered by such balances respectively, and any extra rates caused by market stringency, together with a charge to cover your credit service and facilities."

(Exhibit P–2).

10.  A margin account is a securities account in which a customer purchases securities with, in part, funds lent by the broker.  Under the practice of the parties, when a customer purchases securities on margin, he is required to pay to the broker fifty percent (50%) of the price.  The balance of the purchase price is lent to the customer by the broker, with interest at the broker's call loan rate.  (Testimony of Kirkpatrick and Perelle).

11.  A margin account consists of the following three components:

(a) "long market value"—the present market value of the securities purchased on margin as of a given date,

(b) "debt"—the amount or value of the loan made by the broker to the customer for purchase of the margined securities, and

(c) "equity"—the value of the customer's account (cash or securities) that exceeds the amount of the margin loan as of a given date. (Testimony of Kirkpatrick).

12. Dr. Perelle's margin account was handled by Robert J. Kirkpatrick, III ("Kirkpatrick") at all material times.

13. At all material times prior to October 30, 1978, Dr. Perelle knew the general mechanics of opening and maintaining a margin account and the fact that the downward movement of the positions in his portfolio might require the deposit of additional equity in his account. Dr. Perelle did not know, however, the intricate details applicable to margin accounts, and he was unfamiliar with the mechanics of meeting Merrill Lynch's margin maintenance calls. (Testimony of Perelle).

14. Plaintiff's margin account with Merrill Lynch was one of a group of accounts of Dr. Bazilian's friends handled by Kirkpatrick. These customers relied to a great degree on the investment judgments and advice of Dr. Bazilian.

15. Perelle did not execute a power of attorney in favor of Dr. Bazilian. Perelle was solely responsible for all decisions with respect to his account. (Testimony of Kirkpatrick and Perelle).

16. There are occasions when Merrill Lynch will notify the customer of the need for additional equity in the margin account. This notification is referred to as a "call". There are:

(a) "Regulation T Calls"—notice of the requirement that, upon the purchase of margined securities for the customer's account, the customer must deposit with the broker sufficient funds or securities so that the equity in the customer's account equals fifty percent (50%) of the purchase price of the margined securities, and

(b) "Margin Maintenance Calls"—notice to the customer that additional equity is required in his margin account. Margin maintenance calls are generated by Merrill Lynch when the equity in the customer's account falls below 30% of the value of the securities held in the account. (Testimony of Kirkpatrick).

17. The customer may satisfy or meet margin maintenance calls in the following ways:

(a) by market action, whereby appreciation in the value of the margined securities causes sufficient increase in long market value,

(b) by deposit with the broker of funds equal to the amount of the margin call,

(c) by sale of securities in the account having a value of three and one-third times the amount of the margin call, and

(d) by deposit with the broker of marginable securities having a value one and one-third times the amount of the margin call. (Testimony of Kirkpatrick).

18. The only information Merrill Lynch requested with respect to Dr. Perelle's financial status was the application on which Perelle stated that his income was $50,000 per year. (Testimony of Kirkpatrick; Exhibit No. P–1).

19. In the period from April of 1977 through October of 1978, Dr. Perelle actively traded securities in his Merrill Lynch margin account, consisting of approximately eighty transactions.

20. Most of the investment ideas for the purchase and sale of securities originated with Dr. Bazilian; Perelle had a few ideas of his own. No investment recommendation originated with Merrill Lynch; Merrill Lynch carried no investment opinion on any of the securities purchased or sold by Perelle. (Testimony of Kirkpatrick).

21. Kirkpatrick's service to Perelle as to investments was executing orders to buy or sell placed by Perelle and rendering advice as to the condition of the market or prices

of securities held in the account. (Testimony of Kirkpatrick).

22. In the period from April of 1977 through October of 1978, Perelle promptly and faithfully met each of the approximately twelve Regulation T calls from Merrill Lynch requiring him to deposit additional equity in his account.

23. At no time prior to October of 1978, did Merrill Lynch have occasion to make a margin maintenance call on Dr. Perelle, and it had no reason to suspect that Dr. Perelle would not meet any such calls in a timely and faithful fashion if called upon to do so.

24. As of October 1, 1978, Merrill Lynch did not question Dr. Perelle's financial responsibility. (Testimony of Kirkpatrick).

25. During the period from May, 1977, through October 1, 1978, Perelle made substantial purchases of securities on margin. On or about October 1, 1978, the debt component of his margin account (i.e., the cumulative amount of loans made by Merrill Lynch to Perelle) was in excess of $80,-000.00. (Testimony of Perelle; Exhibit 11(a)).

26. During the month of October, 1978, the stock market experienced a period of very severe decline. (Testimony of Kirkpatrick; Testimony of Derbyshire).

27. The decline in the stock market adversely affected the value of the securities in Perelle's account. (Testimony of Kirkpatrick; Testimony of Perelle).

28. Beginning on October 19, 1978, the following margin maintenance calls were made on Perelle's account:

| Date Call Originated | Date Call Due | Amount of Call |
| --- | --- | --- |
| 10/19/78 | 10/26/78 | $ 2,938.00 |
| 10/20/78 | 10/27/78 | 16,982.00 |
| 10/23/78 | 10/30/78 | 14,627.00 |
| 10/24/78 | 10/31/78 | 19,238.00 |
| 10/25/78 | 11/1/78 | 18,225.00 |
| 10/26/78 | 11/2/78 | 25,649.00 |
| 10/31/78 | 11/7/78 | 12,109.00 |

(Testimony of Kirkpatrick).

29. The calls were made in the ordinary course of business and sent by mail. Despite Perelle's testimony that he did not receive the calls, the court finds that he did receive all these calls.

30. Merrill Lynch's maintenance call record (Exhibits P–4 and P–5) indicates that the margin maintenance calls of October 19, October 20, and October 23 were marked as having been "met in full".

31. Merrill Lynch required that margin maintenance calls be met within seven days, or five business days, of origination. (Testimony of Kirkpatrick).

32. Merrill Lynch's margin maintenance calls were calculated in New York following the close of business on the date of origination of the call. The Philadelphia Office was notified of the call the following morning by a high speed printer which printed on a multi-part margin maintenance call form, the name and address of the customer, the amount of the call and the date or origin. That day an employee of the Philadelphia margin department refigured the amount of the call and established the due date for the call. The multi-part form was separated: one form was delivered to the cashier, one was delivered to the desk of the account executive, and one was delivered to the mail room. The call was also recorded by a clerk on a margin maintenance call record. The procedure was observed during October, 1978. (Testimony of Kirkpatrick; Derbyshire).

33. It was Kirkpatrick's practice, each time he was notified of a margin maintenance call directed to one of his customers, to call that customer, advise him of the call and try to determine how the matter could be resolved. (Testimony of Kirkpatrick).

34. On Friday, October 20, 1978, Perelle had a telephone conversation with Kirkpatrick concerning the status of his account in light of the declining market prices.

35. In the October 20 telephone conversation, Perelle instructed Kirkpatrick to sell his holdings in Community

Psychiatric Centers, North American Mortgage Investment and Robintech.

36. On October 20, 1978, Merrill Lynch sold the above securities, producing proceeds for Dr. Perelle's account of approximately $14,000.00.

37. As of the close of business on Friday, October 20, 1978, Dr. Perelle had positions as follows in his account:

(a) Eight Grolier 13% bonds;

(b) Sixty-five hundred shares of Mohawk Data Sciences; [3]

(c) Forty-four hundred shares of Vertipile; and

(d) Sixty-five hundred shares of Wichita Industries.

38. On Wednesday, October 25, 1978, Kirkpatrick and Perelle had a telephone conversation concerning the condition of the stock market and Perelle's account generally.

39. Perelle knew as of October 25, 1978, that he might be required to deposit additional equity in his account due to the declining prices of the securities that he held.[4]

40. On Friday, October 27, 1978, Perelle called Kirkpatrick, to inquire about the status of his account. In this telephone conversation Perelle informed Kirkpatrick that he would be away for the weekend beginning that afternoon, and gave Kirkpatrick the telephone number where he would be staying.

41. On Sunday, October 29, 1978, Kirkpatrick called Perelle at the telephone number Perelle had supplied. (Testimony of Perelle).

42. In this telephone conversation, Kirkpatrick stated that "all hell broke loose on Friday" and that Perelle's account would have to be liquidated on Monday. (Testimony of Perelle).

3. It appears from the record that Dr. Perelle actually held only 4,000 shares of Mohawk Data Sciences on October 20, 1978.

4. The trial court noted subsequently in its opinion that Dr. Perelle also authorized the sale, on October 25, 1978, of 1,000 shares of Mohawk Data Sciences for the sum of $8,150.26.

43.  Kirkpatrick informed Perelle that liquidation would leave a deficit balance in the account. (Testimony of Kirkpatrick). Dr. Perelle instructed Kirkpatrick not to do anything until he spoke to him. (Testimony of Perelle).

44.  Perelle did not indicate at any time a financial inability to meet margin maintenance calls. (Testimony of Perelle). Perelle never told Kirkpatrick he would not pay the amount due. (Testimony of Perelle).

45.  On October 30, 1978, before speaking with Perelle, Kirkpatrick liquidated Perelle's account.

46.  At no time did Kirkpatrick inform Perelle of the precise amounts owed on the account or options by which he could meet the margin calls or save a portion of his account.

47.  At that time, Perelle had approximately $55,000.00 in cash in Canada, i.e., a Bank of Montreal Certificate of Deposit in the amount of $42,000.00, approximately $7,000.00 to $8,000.00 in four accounts in Montreal, two in his name and two in the name of Black Rock Ltd., Perelle's consulting firm, and approximately $5,000.00 cash on deposit in Credit Suisse in Canada which has an office in New York. (Perelle's testimony).

48.  Within a week after the liquidation, Perelle bought 800 shares of Wichita Industries stock for cash.

49.  Following liquidation of Perelle's account, the account showed a debit balance of $11,452.05. (Exhibit P–13). There remains due and owing to Merrill Lynch the sum of $20,191.77 which includes interest as agreed upon by the parties through March 4, 1982.

50.  Merrill Lynch has demanded that Perelle make payment of the unsecured debit balance but Perelle has refused to make payment of the unsecured debit balance.

51.  Perelle has counterclaimed for breach of fiduciary duty alleging damages of $36,150.00, representing the difference between the liquidation price and the closing prices of Mohawk Data Sciences and Wichita Industries on March 4, 1982, the date of trial.

52. The prices of the liquidated securities during the week of liquidation were as follows:

WICHITA INDUSTRIES

| DATE | HIGH | LOW | CLOSE |
|------|------|-----|-------|
| October 31 | 3½ | 2⅞ | 3½ |
| November 1 | 3¾ | 3⅛ | 3⅛ |
| November 2 | 3⅞ | 3⅛ | 3⅞ |
| November 3 | 4⅛ | 3¾ | 3¾ |

MOHAWK DATA SCIENCES

| DATE | HIGH | LOW | CLOSE |
|------|------|-----|-------|
| October 31 | 7⅛ | 6⅛ | 7⅛ |
| November 1 | 8 | 6⅞ | 7 |
| November 2 | 8½ | 7⅛ | 8⅛ |
| November 3 | 8½ | 7¾ | 8 |

53. The difference between the liquidation price on October 30, 1978, and a repurchase price as of November 3, 1982, is as follows:

WICHITA INDUSTRIES

| | | |
|---|---|---|
| 6500 shares at 4⅛ (high price 10/31–11/3) | $26,812.50 | |
| Less | | |
| 6500 shares at 3 (liquidation price on 10/30) | 19,500.00 | $ 7,312.50 |

MOHAWK DATA SCIENCES

| | | |
|---|---|---|
| 3000 shares at 8½ (high price 10/31–11/3) | $25,500.00 | |
| Less | | |
| 2800 shares at 6⅜ (liquidation price on 10/30) | 17,850.00 | |
| And | | |
| 200 shares at 6¼ (liquidation price on 10/30) | 1,250.00 | $ 6,400.00 |
| | | $13,712.50 |

The trial court also found that appellee's contention that he did not receive the margin call notices sent to him by Merrill Lynch was "not worthy of credence. Over a period of approximately one and one-half years Merrill Lynch sent Dr. Perelle some eighty notices, all of which were duly received.... It is also clear that the sales authorized by Perelle on October 20 and October 25, 1978 were made in response to margin calls and that the proceeds were in fact

applied to satisfy the calls. (Exhibits P-4, P-5)." (Tr.Ct. Opinion, pp. 14–15).

## I.

■ The trial court concluded that the margin maintenance contract was an unambiguous contract which had been entered into by two competent parties dealing at arm's length, and was, therefore, enforceable according to the provisions contained therein. We agree. Where the language of a contract is clear and unambiguous, a court is required to give effect to that language. *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 304, 469 A.2d 563, 566 (1983). " 'It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves without regard to its wisdom or folly.' " *Amoco Oil Company v. Snyder,* 505 Pa. 214, 221, 478 A.2d 795, 798 (1984) *quoting Steuart v. McChesney,* 498 Pa. 45, 51, 444 A.2d 659, 662 (1982). *Accord Rusiski v. Pribonic,* 326 Pa.Super. 545, 550, 474 A.2d 624, 627 (1984).

■ As heretofore observed, the customer agreement executed by Dr. Perelle granted Merrill Lynch the right to liquidate Dr. Perelle's margin account "whenever in your discretion you consider it necessary for your protection ... without demand for margin or additional margin, notice of sale ... or other notice or advertisement ... it being further understood that I shall at all times be liable for the payment of any debit balance owing in any of my accounts with you upon demand, and that I shall be liable for any deficiency remaining in any such account(s) in the event of the liquidation thereof in whole or in part by you or by me...."

While the contract bestowed upon Merrill Lynch the right to liquidate Dr. Perelle's account *without any notice* to him and *without any demand for additional margin funds,* the trial court found that Merrill Lynch had sent and Dr. Perelle had received demands for additional margin.

Dr. Perelle failed, however, to meet in full the outstanding margin calls due on October 27 and October 30, 1978. As heretofore observed, the first margin call, in the amount of $2,938.00, was due on October 26; the second call, in the amount of $16,982.00, was due on October 27; and the third call, in the amount of $14,627.00, was due on October 30. Dr. Perelle authorized the sale on October 20 of his shares in Community Psychiatric Services, Robinson Technical and North American Mortgage which resulted in a yield of $14,400.00. However, this sum served to reduce the margin deficit in Dr. Perelle's account by only $4,800.00.[5] Again, on October 25, Dr. Perelle authorized the sale of 1000 shares of Mohawk Data Sciences resulting in a yield of $8,150.26, which further reduced his outstanding margin call by approximately $2,716.00. Thus, the total sum realized by these sales, approximately $7,516.00, and applied to reduce the outstanding margin deficit, was insufficient to meet in full the calls *due* on October 27 and 30, 1978.

Liquidation of Dr. Perelle's account, therefore, occurred only after his failure to timely meet the margin call outstanding on October 27,[6] and was thus necessary and proper under the terms of the customer agreement which granted Merrill Lynch the right to liquidate even in the absence of an overdue margin call.

Having properly liquidated Dr. Perelle's account, Merrill Lynch was entitled to recover from him the amount of the deficit as well as the interest provided for in the customer agreement. *See Lincoln Commodity Services v. Meade,* 558 F.2d 469, 473 (8th Cir.1977); *Geldermann & Company, Inc. v. Lane Processing, Inc.,* 527 F.2d 571 (8th Cir.1975); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks,* 404 F.Supp. 905 (N.D.Tex.1975) *aff'd.* 548 F.2d 615 (5th Cir.1977) *cert. denied* 434 U.S. 855, 98 S.Ct. 173, 54 L.Ed.2d

---

**5.** *See* Trial Court's Finding of Fact 17(c).

**6.** *See* Notes of Testimony at 11.2:

Q: Had the margin call issued on October 20th due October 27th in the amount of $16,982 been satisfied as of October 27th?
A: [Kirkpatrick] No, it had not.

126 (1977); *Kohlmeyer & Co. v. Sobert,* 273 So.2d 884 (La.App.1973) *aff'd.* 286 So.2d 342 (La.1973).

## II.

■ Appellee contends that the trial court erred in refusing to hold that Merrill Lynch's alleged breach of fiduciary duty was a complete defense to the contract action. Appellee has not provided either the trial court or this Court with any case law in support of his position but rather argues that the references to the power of a party to avoid a contract for abuse of a fiduciary duty contained in Sections 380 and 381 of the Restatement (Second) of Contracts [7] support his position.

The Section of the Restatement actually applicable to abuse of a fiduciary duty by one who is a party to a contract is Section 173 of the Restatement (Second) of Contracts, which provides:

> If a fiduciary makes a contract with his beneficiary relating to matters within the scope of the fiduciary relation, the contract is *voidable* by the beneficiary, unless
>
> (a) it is on fair terms, and
>
> (b) all parties beneficially interested manifest assent with full understanding of their legal rights and of all

---

7. Section 380 of the Restatement (Second) of Contracts provides in relevant part:

§ 380. Loss of Power of Avoidance by Affirmance
(1) The power of a party to avoid a contract for incapacity, duress, undue influence or abuse of a fiduciary relation is lost if, after the circumstances that made the contract voidable have ceased to exist, he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance.

Section 381 of the Restatement (Second) of Contracts provides in relevant part:

§ 381. Loss of Power of Avoidance by Delay
(1) The power of a party to avoid a contract for incapacity, duress, undue influence or abuse of a fiduciary relation is lost if, after the circumstances that made it voidable have ceased to exist, he does not within a reasonable time manifest to the other party his intention to avoid it.

relevant facts that the fiduciary knows or should know. (emphasis supplied).

This section thus makes such a contract *voidable* under certain circumstances; however, Sections 376, 383 and 384 make clear that a party who seeks to avoid a contract based upon breach of fiduciary duty must avoid the entire contract and not simply disaffirm *part* of the contract that is particularly disadvantageous to himself, *see* Restatement (Second) of Contracts § 383, and must return any benefit which he has received from the other party. *See* Restatement (Second) of Contracts § 384.

As appellee did not contend, either in his pleadings or at trial, that the contract was unfair or that his assent to the contract was improperly procured, the contact is not voidable pursuant to Section 173 of the Restatement (Second) of Contracts. Moreover, the relief appellee seeks, which includes: (a) the increase in the value of the stocks between the date of liquidation and trial, (b) the funds loaned to him by Merrill Lynch, and (c) all interest which would have been due Merrill Lynch on those funds, is not the relief available to a party who seeks to avoid a contract based upon abuse of a fiduciary relation. Thus, the trial court properly rejected appellee's argument that a breach of fiduciary duty on the part of Merrill Lynch was a complete bar to recovery in the action on the contract.

### III.

Both appellant and appellee dispute the findings of the trial court concerning the duties owed by Merrill Lynch to Dr. Perelle as well as the legal effect of a breach of those duties.

The trial court, in awarding damages to Dr. Perelle on his counterclaim, noted that Dr. Perelle "breached [his] agreement to supply the required margin. Under the terms of the agreement [Merrill Lynch] had the right to sell the collateral and recover any deficit. However, [Merrill Lynch] was also [Dr. Perelle's] broker ... during the phone calls in question on Friday and again on Sunday, October

29, Kirkpatrick was dealing with [Dr. Perelle] as his broker, i.e., his agent. His obligations to inform, advise and follow his principal's instructions had not terminated.... We note that requiring a broker to inform his client of the exact amount due and other courses of action for meeting margin requirements is not unduly burdensome." The trial court then concluded that Merrill Lynch, through its agent Mr. Kirkpatrick, had:

> (a) failed to keep Dr. Perelle informed of vital information concerning the status of his account in the period from October 19 to October 30, 1978;

> (b) failed to advise Dr. Perelle that he could ask for and perhaps obtain an extension of time to meet the margin call;

> (c) failed to tell Dr. Perelle in the Sunday, October 29, 1978, telephone conversation the precise amount of money that was required of him on Monday in order to meet the margin call or inform him of other options; and

> (d) failed to obey Dr. Perelle's instruction on October 29, to advise him before doing anything.

(Tr.Ct.Opinion, p. 27).

■ The relationship between a broker and his customer is one of principal and agent by virtue of which the broker is subject to certain fiduciary obligations to his client.[8] *See Jaksich v. Thomson McKinnon Securities, Inc.*, 582 F.Supp. 485, 502 (S.D.N.Y.1984); *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 946 (S.D.N.Y.1979); *Berkowitz v. Mayflower Securities, Inc.*, 455 Pa. 531, 532, 317 A.2d 584, 585 (1974). One of these duties is the duty to communicate

---

**8.** Merrill Lynch argues that the trial court erred in finding the "shingle theory" of broker liability applicable to Merrill Lynch under the circumstances of this case. *See Charles Hughes & Co. v. Securities and Exchange Commission,* 139 F.2d 434 (2nd 1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944). However, as noted by appellee, while the court *discussed* the shingle theory in its opinion, it did not apply the theory to this case. We need not, therefore, decide whether, under the circumstances of this case, the shingle theory of responsibility is applicable to Merrill Lynch as a securities broker-dealer.

certain information to the client as outlined in Section 381 of the Restatement (Second) of Agency:

Unless otherwise agreed, an agent is subject to a duty to use reasonable effort to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.

See *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107, 111 (N.D.Ala.1971) *aff'd.,* 453 F.2d 417 (5th Cir.1972).

■ Other duties owed by a stockbroker to his customer are, in part, determined by the nature of the contract between the parties as well as by the type of account maintained by the customer. *See Chipser v. Kohlmeyer & Company,* 600 F.2d 1061, 1066–1067 (5th Cir.1979). Where the account is a nondiscretionary account[9] such as the account maintained by Dr. Perelle, the duties of the broker include:

(1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis. *Cash v. Frederick and Co.,* 57 F.R.D. 71 (E.D.Wis.1972); *Hanly v. S.E.C.,* 415 F.2d 589 (2d Cir.1969); (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests, *Richardson v. Shaw,* 209 U.S. 365, 28 S.Ct. 512, 52 L.Ed. 835 (1908); *Robinson v. Merrill Lynch,* 337 F.Supp. 107 (N.D.Ala.1971), *aff'd,* 453 F.2d 417 (5th Cir.1972), and cases cited therein; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security, *Hanly v. S.E.C., supra; Cash v. Frederick and Co., supra;* (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recom-

9. A non-discretionary account is an account in which the customer rather than the broker determines which purchases and sales to make. *See Mullis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 492 F.Supp. 1345, 1351 n. 6 (D.Nev.1980); *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 952 (E.D.Mich.1978).

mended security, *Chasins v. Smith Barney & Co.*, 438 F.2d 1167 (2d Cir.1971); *S.E.C. v. Capital Gains Bureau,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); (5) the duty not to misrepresent any fact material to the transaction, *Carras v. Burns* [516 F.2d 251 (4th Cir.1975)], *supra; Shorrock v. Merrill Lynch,* CCH Fed.Sec.L.Rep. ¶ 96,251 (D.Or., Nov. 18, 1977); and (6) the duty to transact business only after receiving prior authorization from the customer, *Robinson v. Merrill Lynch, supra.*

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951, 953 (E.D.Mich.1978). *Accord Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 337 F.Supp. at 111.

■ We do not agree with the conclusion of the trial court that Merrill Lynch, through its agent Mr. Kirkpatrick, had breached its fiduciary duty to appellee by failing to inform him "that he could ask for and perhaps obtain an extension of time to meet the margin call."

Mr. Kirkpatrick testified that the permission of the sales manager or office manager was required in order to obtain an extension of time to meet a margin maintenance call and that reasons acceptable to management included: "Physical reasons that are difficult to circumvent. A client is out of town, the market goes down, he's on a business trip and you can't get him. For extenuating circumstances margin-call extensions are granted, but they're not granted on a regular basis and there must be an exception made for them to be granted." (N.T. 111.2–112.2).

Minimum margin maintenance requirements are established by the rules and regulations of the various exchanges which are empowered to discipline member brokers for violations thereof. *See Jablon v. Witter, supra,* 614 F.2d at 679–690 n. 4; Securities Exchange Act of 1934, 15 U.S.C. § 78f(b). A minority of courts have found brokers liable for failure to promptly liquidate accounts which have become under margined as a result of market action. *See and compare Lincoln Commodity Services v. Meade, supra,* 558 F.2d at 473 (Rules 928 and 942 of the Chicago

Mercantile Exchange); *Geldermann & Company, Inc. v. Lane Processing, Inc., supra,* 527 F.2d at 574–577 (Margin requirements of Commodity Exchange Commission and the Chicago Board of Trade); *Gordon v. duPont Glore Forgan, Inc.,* 487 F.2d 1260, 1261 n. 1 (5th Cir.1973) *cert. denied,* 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666 (1974) (New York Stock Exchange Rule 431 setting minimum margin maintenance level at twenty-five percent); *First Mid America, Inc. v. Palmer,* 197 Neb. 224, 228, 248 N.W.2d 30, 34 (1976) (Rule 928(c) of the Chicago Mercantile Exchange; Rule 210 of the Chicago Board of Trade); Anno., *Private Federal Right of Action Against Brokerage Firm for Violation of Exchange or Dealer Association Rule,* 54 ALR Fed. 11 (1981). The customer agreement entered into between the parties provided, *inter alia:* "Any transaction shall be subject to the constitution, *rules, regulations,* customs and usages of the exchange or market (and its clearing house, if any), where executed." (emphasis supplied).

No extenuating circumstances existed in the instant case, such as a suggestion by appellee that an extension was required in order to transmit the necessary funds or an inability on the part of Merrill Lynch to notify appellee of the margin call. In the absence of unusual circumstances, it would be unreasonable to require that brokers routinely suggest to their margin customers the possibility of obtaining extensions within which to meet margin maintenance calls. Moreover, such a requirement would impose upon Merrill Lynch an obligation inconsistent with the terms of its customer agreement as well as a duty not consistent with its obligations under applicable exchange rules. Thus, we are constrained to find that the court erred in holding that Merrill Lynch breached its fiduciary duty when it failed to inform appellee that he could seek an extension of time within which to meet the margin maintenance calls.

## IV.

The trial court also found that Merrill Lynch breached a fiduciary owed to appellee by failing to inform him

during the conversation of Sunday, October 29, 1978, the "precise amount of money that was required of him on Monday in order to meet the margin call...."

Initially, it must be noted that the trial court found as a fact that Dr. Perelle received each of the margin maintenance calls mailed to him by Merrill Lynch.[10]  As heretofore observed, a call was not *due* until seven days after its issuance.  Dr. Perelle had received the margin maintenance calls *due* on October 27 and October 30 *prior* to the telephone conversation of Sunday, October 29 and was, therefore, aware of the "precise amount of money" that was required to meet the margin maintenance calls *due* on October 27 and October 30.  Thus, even were we to assume for purposes of this appeal that Merrill Lynch did breach a duty owed to appellee to use reasonable efforts to provide appellee with all relevant information concerning his account, the failure of Mr. Kirkpatrick to tell appellant the exact amount of the equity deficit in the margin account on Sunday night did not result in any damage to appellee.  The margin account was liquidated as a result of appellee's failure to timely meet the outstanding and overdue notices.  Any calls *issued* on October 27 or thereafter would not fall due for seven days thereafter and could have been cancelled in the interim by virtue of market action.[11]

## V.

■  The trial court found, as well, that Merrill Lynch breached its fiduciary duty to appellee when it failed "to obey Dr. Perelle's instruction on October 29, to advise him before doing anything."  We cannot agree.  The customer agreement granted Merrill Lynch the right to liquidate the margin account at any time, "without demand for margin or additional margin [or] notice of sale...."  While the parties were free to alter their contract by mutual agreement or

10.  Dr. Perelle testified under cross-examination that he thought that notices routinely mailed to him by Merrill Lynch arrived approximately one or two days after they were sent.  See N.T. 38.2–43.3.

11.  The market did, in fact, begin to rise after October 30, 1978.

course of conduct, no evidence of any modification of the contract was offered by either party. Thus, there was no breach of a fiduciary duty by Merrill Lynch when it liquidated the margin account pursuant to the terms of the customer agreement after appellee had failed to meet a margin maintenance call.

## VI.

The trial court proceeded to find that Merrill Lynch breached a fiduciary duty owed to appellee when it failed to keep him "informed of vital information concerning the status of his account in the period from October 19 to October 30, 1978."

The trial court accepted the testimony of Dr. Perelle and found that "[a]t no time did Kirkpatrick inform Perelle of the precise amounts owed on the account or options by which he could meet the margin calls or save a portion of his account." We cannot agree that Merrill Lynch breached a fiduciary duty as a result of Mr. Kirkpatrick's failure to inform Dr. Perelle of the precise amounts owed on the account or the options by which he could meet the margin calls or save a portion of his account.

The trial court found that Merrill Lynch had mailed and Dr. Perelle had received each of the margin maintenance calls issued in October of 1978 as well as all regular monthly statements and confirmations of transactions. Dr. Perelle was, therefore, aware of the precise amount due on October 30, 1978, in order to prevent liquidation of his margin account.

As previously noted, Dr. Perelle maintained a nondiscretionary account with Merrill Lynch. Due to the nature of the account, the services rendered to Dr. Perelle by Mr. Kirkpatrick consisted of "executing orders to buy or sell placed by Perelle and rendering advice as to the condition of the market or prices of securities held in the account." Finding of Fact # 21.

■ Merrill Lynch performed all that was required of it when it mailed margin call notices to Dr. Perelle. Such notification was sufficient to satisfy its obligation to "use reasonable effort to give [its] principal information ... relevant to [the] affairs entrusted to [it]. . . ." Restatement (Second) of Agency, § 381. Merrill Lynch was under no duty to inform Dr. Perelle of the "precise amounts owed on the account or options by which he could meet the margin calls or save a portion of his account."

As we have concluded that Merrill Lynch fulfilled its obligation to use *reasonable efforts* to inform Dr. Perelle of the outstanding margin calls by mailing the margin call notices to him, we reject the conclusion of the trial court that Merrill Lynch breached a fiduciary duty owed to Dr. Perelle when its agent, Mr. Kirkpatrick:

(a) failed to keep Dr. Perelle informed of vital information concerning the status of his account in the period from October 19 to October 30, 1978;

(b) failed to advise Dr. Perelle that he could ask for and perhaps obtain an extension of time to meet the margin call;

(c) failed to tell Dr. Perelle in the Sunday, October 29, 1978, telephone conversation the precise amount of money that was required of him on Monday in order to meet the margin call or inform him of other options; and

(d) failed to obey Dr. Perelle's instruction on October 29, to advise him before doing anything.

In the absence of any breach of duty on the part of Merrill Lynch, the award of damages to Dr. Perelle in the amount of $13,715.50 must be reversed.

## VII.

Both appellee and appellant argue that the court erred in applying Section 8335 of the Judicial Code, 42 Pa.C.S.

§ 8335,[12] to determine the amount of damages awarded to appellee on his counterclaim for breach of fiduciary duty.[13]

While we believe that the court properly applied Section 8335 of the Judicial Code, fixing four days as a "reasonable time" thereunder, our disposition of these appeals has rendered the issue moot.

We, therefore, affirm the judgment in the amount of $20,191.77 entered in favor of Merrill Lynch and reverse the judgment entered in favor of Dr. Perelle on his counterclaim. Jurisdiction is relinquished.

HOFFMAN, J., files concurring opinion.

HOFFMAN, Judge, concurring:

I agree with the majority's conclusion that judgment entered in favor of appellee, Dr. Perelle, on his counterclaim must be reversed. I cannot agree, however, with the majority's holding that a broker, as an agent, has an obligation to use reasonable efforts to inform its client, the principal, of the precise amount of money due to prevent liquidation of a nondiscretionary margin account. For the following reasons, I would hold that no such fiduciary duty exists.

Under the law of this Commonwealth,[1] a fiduciary relationship exists between a broker and a client. *Berkowitz v.*

12. Section 8335 of the Judical Code provides:
**§ 8335. Damages for conversion of property of fluctuating value**
Damages for the conversion of stocks, bonds, or other like property of fluctuating value shall be limited to the difference between the proceeds of the commission, or that portion thereof duly paid or credited to the owner, and such higher value as the property may have reached within a reasonable time after he had notice of the conversion. Where the facts are not in dispute, such period shall be fixed by the court as a matter of law.

13. Appellee argued that the correct measure of damages was the difference between the market price at the time of trial and the liquidation price, the sum of $36,150.00. Appellant argued that the court incorrectly found four days to be a "reasonable time" under Section 8335 of the Judicial Code, 42 Pa.C.S. § 8335.

1. The trial court found that, "[a]lthough the contract provides that it is to be governed by New York [l]aw, the counterclaim alleging breach of fiduciary duty is governed by the law of the forum." Lower Court Opinion of February 4, 1983 (docketed February 24) at 18. Both parties argue Pennsylvania law in their briefs to this Court. *See* Brief

*Mayflower Securities, Inc.,* 455 Pa. 531, 533 n. 2, 317 A.2d 584, 585 n. 2 (1974) (citing *Butcher v. Newburger,* 318 Pa. 547, 179 A. 240 (1935)). An agent is, of course, a fiduciary only with respect to matters within the scope of its agency. Restatement (Second) of Agency (Restatement) § 13 (1958). "The scope of affairs entrusted to a broker is generally limited to the completion of a transaction." *Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937, 947 (S.D.N.Y.1979). Thus, the agency relationship exists when a client places an order to buy or sell, and terminates when the transaction is completed. *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107, 111 (N.D.Ala.1971). The majority correctly sets forth the duties incident to such transactions. *See* majority slip op. at 561 (citing *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 953 (E.D.Mich.1978)).

Here, the claimed breaches of fiduciary duty are not with respect to buy or sell orders placed by appellee, but rather with respect to appellant's, Merrill Lynch, Pierce, Fenner & Smith, Inc.'s, liquidation of appellee's non-discretionary margin account pursuant to the parties' margin agreement. The trial court found that appellant, through its agent, Mr. Kirkpatrick, had breached its fiduciary duty by several omissions to act. *See* majority at 181–182. I believe, however, that contract, not fiduciary, principles govern this case. *See Berkowitz v. Mayflower Securities, Inc., supra,* 455 Pa. at 534–35, 317 A.2d at 585–86 (plaintiff's failure to pay for stock constituted a material breach of the parties' subscription agreement; no fiduciary duty on defendant's part to notify plaintiff of the pending cancellation of his order).

As the majority points out, a margin account is, in essence, a loan. Majority at 168 n. 1. A fiduciary "act[s] primarily for the benefit of another...." Restatement, *supra* § 13 comment a. In its role as a creditor, appellant does not act primarily for appellee:

for Appellant at 18; Brief for Appellee at 25. I find it unnecessary to consider whether the trial court applied the proper state's law because my research has disclosed no New York State case that stands for the proposition that appellee advances. *But see* note 3 infra.

[M]ortgagees, pledgees, and other similar power holders, although having power to sell the property involved under certain conditions or to subject another to contractual liability, are not agents of the power giver; they have not undertaken to exercise such power primarily for the benefit of the person in whose name they formally act, and they are entitled to prefer their own interests in dealing with the subject matter.

*Id.* comment b; *see also id.* § 14 H. That a broker acts primarily for its own benefit in requiring additional margin or in liquidating a customer's account is unquestioned. "House margin requirements ... are established primarily to protect the broker by assuring sufficient collateral for credit extended to finance customer speculation...." *Altschul v. Paine, Webber, Jackson & Curtis Inc.*, 518 F.Supp. 591, 596 (S.D.N.Y.1981). "Stockbrokers carrying marginal accounts do not receive remuneration commensurate with the risk of [excessive losses], and hence must act swiftly in such cases." *Yohey v. Burton,* 139 Pa.Superior Ct. 393, 404, 11 A.2d 794, 799 (1940). Furthermore, "[a] principal has the right to control the conduct of the agent with respect to matters entrusted to him." Restatement, *supra* § 14. Surely it cannot be said that a customer can control his or her broker's conduct when the broker seeks to protect itself from losses on its loans.

Here, the margin agreement gave appellant the right, whenever in its discretion it considered the exercise of such right necessary for its protection, "to sell any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase or other notice or advertisement...." The agreement further stated that "it [was] understood that a prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of [appellant's] right to sell or buy without demand or notice...." It may be that appellant must exercise its discretion reasonably, *see Schenck v. Bear, Stearns & Co., supra* at 949, or that other contract principles, such as course of dealing or waiver, may be

applicable to cases like this one,[2] but I would hold that fiduciary principles have no place here.[3]

**2.** The only claim presented by appellee at trial was a breach of fiduciary duty claim. Brief for Appellee at 17.

**3.** *But see Gordon v. duPont Glore Forgan Inc.,* 487 F.2d 1260, 1261–62 (5th Cir.1973) (reverses trial court's finding that plaintiffs were entitled to recover for defendant's breach of fiduciary duty to notify them that their account was undermargined because they knew of their broker's breach and took no action) (Florida law), *cert. denied,* 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666 (1974); *Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985, 992–93 (S.D.N.Y.1984) (under New York law, broker has fiduciary duty to use reasonable efforts to give its customer information relevant to affairs entrusted to it; suggesting, on defendants' motion for summary judgment, that a margin account cannot be liquidated without authorization or notice).